USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit
 ____________________
 
 
 No. 97-1953
 
 RAUL PERCIRA GONCALVES
 
 Petitioner, Appellant,
 
 v.
 
 JANET RENO, Attorney General of the United States;
 DORRIS MEISSNER, Commissioner of the Immigration and
 Naturalization Service; 
 STEVE FARQUHARSON, INS District Director, Boston District;
 DEPARTMENT OF JUSTICE;
 and
 IMMIGRATION AND NATURALIZATION SERVICE,
 
 Respondents, Appellees.
 
 
 ____________________
 
 APPEAL FROM THE UNITED STATES DISTRICT COURT
 
 FOR THE DISTRICT OF MASSACHUSETTS
 
 [Hon. Richard G. Stearns, U.S. District Judge]
 
 ____________________
 
 Before
 
 Stahl, Circuit Judge,
 
 Campbell, Senior Circuit Judge,
 
 and Lynch, Circuit Judge.
 ____________________
 
 Frederick Q. Watt, with whom Watt & Sylvia and Lee
 Gelernt, Lucas Guttentag, Cecillia Wang, Michael Wishnie and
 the American Civil Liberties Union Immigrants' Rights Projectwere on brief, for appellant.
 Frank W. Hunger, Assistant Attorney General, Civil
 Division, with whom William J. Howard, Senior Litigation
 Counsel, and Edward J. Duffy, Attorney, Civil Division, Office
 of Immigration Litigation, United States Department of Justice
 were on brief, for appellees.
 Gerald L. Neuman and Lenni B. Benson for amici curiae
 Debra Anker, Lecturer in Law, Harvard Law School; Prof. Lenni
 B. Benson, New York Law School; Carolyn Patty Blum, Lecturer in
 Law, University of California at Berkeley School of Law; Prof.
 Richard A. Boswell, Hastings College of the Law, University of
 California; Prof. Erwin Chemerinsky, University of Southern
 California; Prof. David D. Cole, Georgetown University Law
 Center; Prof. Michael J. Churgin, University of Texas School of
 Law; Prof. Mary L. Dudziak, University of Iowa College of Law;
 Prof. Joan M. Fitzpatrick, University of Washington School of
 Law; Prof. Maryellen Fullerton, Brooklyn Law School; Prof.
 Kevin R. Johnson, University of California at Davis School of
 Law; Prof. Daniel Kanstroom, Boston College Law School; Prof.
 Harold Hongju Ko, Yale Law School; Prof. Stephen H. Legomsky,
 Washington University School of Law; Prof. Hiroshi Motomura,
 University of Colorado School of Law; Prof. Gerald L. Neuman,
 Columbia University School of Law; Prof. Carol Sanger, Columbia
 University School of Law; Prof. John Scanlan, Indiana
 University School of Law at Bloomington; Prof. Peter H. Schuck,
 Yale Law School; Prof. Peter J. Spiro, Hofstra University
 School of Law; Prof. Margaret H. Taylor, Wake Forest University
 School of Law; Prof. Larry W. Yackle, Boston University School
 of Law.
 Linton Joaquin and Manuel D. Vargas for amici curiae
 National Immigration Law Center and American Immigration
 Lawyers Association.
 ____________________
 May 15, 1998
 
 ____________________
 LYNCH, Circuit Judge. Raul Goncalves has been a
 permanent resident alien for twenty-five years, ever since he
 arrived in the United States at the age of three, and now is
 subject to deportation because he has committed crimes of moral
 turpitude such as theft, possession of marijuana and the like. 
 He filed an application in 1994 for discretionary relief from
 deportation with the immigration authorities under 212(c) of
 the Immigration and Nationality Act (INA), as the law permitted
 him to do.
 While Goncalves' application was still pending,
 Congress enacted the Antiterrorism and Effective Death Penalty
 Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr.
 24, 1996), which, at 440(d), restricted the availability of
 discretionary relief. The question then arose as to whether
 Congress intended these restrictions to apply retroactively. 
 The Board of Immigration Appeals (BIA) said that Congress did
 not intend the restrictions to be fully retroactive, and that
 at least those aliens whose applications were pending on the
 date of AEDPA's enactment, like Goncalves, could continue to
 pursue their applications for relief. The Attorney General
 disagreed, reversed the BIA, and required the dismissal of all
 pending applications for 212(c) relief (even appeals from
 cases where immigration judges had said relief should be
 granted). As a result, Goncalves' application was dismissed
 without being heard by the BIA and he was taken into custody by
 federal officials.
 Goncalves filed a petition for habeas corpus in the
 district court, rather than filing for direct review in this
 court. This he was required to do by the precedent of this
 court. See Kolster v. INS, 101 F.3d 785 (1st Cir. 1996). The
 district court dismissed the petition, finding the Attorney
 General, and not the BIA, was correct in the interpretation of
 the statute.
 Goncalves appealed, raising pure issues of law,
 including a challenge to the Attorney General's interpretation
 of the statute and constitutional claims. The Attorney General
 defends on two fronts. Goncalves filed in the wrong court, she
 says. He should have filed in the court of appeals, he missed
 the deadline to do so, and so the case must be dismissed. In
 fact, she says, Congress sub silentio stripped the district
 courts of their traditional habeas jurisdiction under 28 U.S.C.
 2241 to hear claims of the type Goncalves asserts. Secondly,
 she says, no court may review her decision as to whether
 Congress intended the restrictions in AEDPA 440(d) to apply
 to pending applications. Congress exempted her decision from
 any judicial review when it enacted the Illegal Immigration
 Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub.
 L. No. 104-208, Div. C., 110 Stat. 3009-546 (enacted Sept. 30,
 1996). In any event, she argues, her decision is entitled to
 deference. We find the Attorney General's arguments
 unpersuasive and agree that Goncalves may still pursue his
 claim for 212(c) relief. We reverse and remand this case to
 the BIA.
 A summary of our reasoning may be helpful. This case
 presents two sets of major issues. The first is which federal
 court, if any, has jurisdiction to hear Goncalves' claims. We
 conclude that Congress has divested the United States Courts of
 Appeals of their former statutory jurisdiction to hear such
 cases on direct review of the administrative agency's decision. 
 We further conclude, following Felker v. Turpin, 116 S. Ct.
 2333 (1996), that Congress neither explicitly nor by
 implication repealed the grant of jurisdiction in 28 U.S.C. 
 2241 to issue writs of habeas corpus to persons in federal
 custody which the federal district courts have had since 1789
 and which has always been available in immigration cases. 
 If there is jurisdiction, we ask whether Congress
 intended nevertheless to restrict the scope of review to
 preclude review of Goncalves' claims. To the extent that
 Congress intended to narrow the scope of review of
 discretionary decisions by the administrative agency, we note
 that this case does not involve any such exercise of
 discretion, but rather concerns a pure issue of law. That pure
 issue of law, of whether Congress intended to make a particular
 provision of a statute retroactive, is of a type traditionally
 resolved by the courts. We discern no intent by Congress to
 restrict the scope of judicial review of that question. Our
 conclusion avoids the need to reach novel and complex
 constitutional issues under the Suspension Clause, Article III,
 the Due Process Clause and the Equal Protection Clause.
 The second major set of issues addresses the merits:
 is the Attorney General correct in her interpretation that
 AEDPA 440(d), as amended by IIRIRA, eliminates eligibility
 for 212(c) relief retroactively for aliens convicted of
 crimes involving moral turpitude? We analyze the question
 under Landgraf v. USI Film Prods., 511 U.S. 244 (1994), and
 Hughes Aircraft Co. v. United States ex rel. Schumer, 117 S.
 Ct. 1871 (1997), cases concerning the temporal application of
 new statutes. We conclude, contrary to the Attorney General,
 that Congress did not intend its new provisions restricting
 such discretionary relief to apply retroactively. The
 statute's text reveals numerous instances where Congress used
 explicit language to make its new restrictions apply
 retroactively; for example, it used such language with respect
 to alien terrorists. But there is no such explicit text as to
 aliens in Goncalves' position.
 We check our interpretation of the text against the
 legislative history to ensure we have not gone astray. That
 history shows three things. First, Congress expressly
 considered a provision which would have explicitly made the new
 restrictions on 212(c) relief applicable retroactively and
 chose not to enact that provision. Second, Congress was keenly
 aware of the problem of whether restrictions on relief should
 apply retroactively. Third, Congress enacted IIRIRA against
 the backdrop of an administrative ruling by the BIA that the
 restrictions on 212(c) relief for aliens convicted of crimes
 involving moral turpitude, contained in AEDPA 440(d), was not
 fully retroactive and did not apply to pending applications. 
 In the face of that ruling, the same Congress that had enacted
 AEDPA chose, in IIRIRA, not to amend AEDPA explicitly to
 provide that the AEDPA 440(d) restrictions applied
 retroactively. It made that choice even though, in IIRIRA 
 306, it amended AEDPA 440(d), the very subsection at issue,
 in other respects. We therefore conclude that the BIA is
 required to consider Goncalves' application for 212(c) relief
 from deportation. Whether the immigration authorities grant or
 deny that application, is, of course, within their discretion.
 I. Facts and Procedural History Raul Percira Goncalves is a lawful permanent resident
 of the United States. He committed a series of thefts, he says
 while under the influence of alcohol, and was incarcerated. He
 has been convicted of charges of breaking and entering,
 larceny, possessing burglary tools, receiving stolen property,
 and one charge of possession of marijuana. Those non-violent
 offenses, Goncalves conceded, are crimes "involving moral
 turpitude" and subjected him to deportation. See Immigration
 and Nationality Act (old INA) 241(a)(2)(A)(ii), House
 Judiciary Comm. Print, 104th Cong., 1st Sess. (10th ed. 1995)
 (reflecting laws enacted as of May 1, 1995), now renumbered as
 INA 237(a)(2)(A)(ii) and codified at 8 U.S.C.A. 
 1227(a)(2)(A)(ii) (West Supp. 1998) ("Any alien who at any
 time after entry is convicted of two or more crimes involving
 moral turpitude, not arising out of a single scheme of criminal
 misconduct . . . is deportable."). On his release from prison
 in May of 1994, he was taken into custody for deportation,
 although he was released on bail while his petition was pending
 before the INS. In the interim he attended meetings of
 Alcoholics Anonymous. He has since earned his high school
 equivalency diploma, married, had a child, and been gainfully
 employed.
 At the time the deportation proceedings against him
 commenced, Goncalves was eligible to apply to the Attorney
 General for a discretionary waiver of deportation. That is
 because he was a lawful permanent resident, had seven years of
 "lawfully unrelinquished domicile" and the crimes he committed
 were not "aggravated" felonies. See old INA 212(c); see alsoFrancis v. INS, 532 F.2d 268 (2d Cir. 1976) ( 212(c) relief is
 available in deportation as well as exclusion proceedings);
 Matter of Silva, 16 I. & N. Dec. 26 (BIA 1976) (adopting
 Francis decision nationwide). He had no right to remain in
 this country, but he was entitled by 212(c) to apply for a
 waiver of deportation and ask the Attorney General, in the
 exercise of her discretion, to allow him to remain here.
 Goncalves applied for 212(c) relief in September
 1994. Under the law in effect in 1994, an alien applying for
 a waiver first presented his case to an Immigration Judge (IJ),
 as Administrative Law Judges are known in the INS's Executive
 Office for Immigration Review. The IJ was required to balance
 the positive and adverse factors in determining whether a
 waiver was warranted, and to justify his or her decision,
 whether in favor or against granting a waiver, to allow review
 by the BIA and the courts. See Matter of Marin, 16 I. & N.
 Dec. 581, 585 (BIA 1978) (listing factors). The IJ agreed that
 Goncalves was statutorily eligible to apply for 212(c) relief
 but Goncalves failed to convince the IJ that he was worthy of
 it. On Jan. 20, 1995 the IJ denied his application and
 Goncalves took a timely appeal. And there the case sat for
 more than two years, undoubtedly because of the very large
 number of cases that were pending before the Board. See H.R.
 Rep. No. 104-469, pt. 1, at 119 (1996) (noting that over 17,000
 aliens filed appeals to the BIA in 1995).
 The BIA never reached the merits of Goncalves'
 application. On March 24, 1997, the BIA dismissed Goncalves'
 appeal on the grounds that he was no longer statutorily
 eligible for 212(c) relief, as a result of enactment of AEDPA
 in the interim. The BIA was compelled to do so by the decision
 of the Attorney General in Matter of Soriano, Int. Dec. 3289,
 1996 WL 426888 (Op. Att'y Gen. Feb. 21, 1997) (beginning at
 *16). The Attorney General's decision in Soriano concluded
 that Congress intended to make the new restrictions on 212(c)
 relief contained in AEDPA 440(d) retroactive and that the new
 restrictions should be applied even to those applications filed
 before the date of AEDPA's enactment. Soriano required the
 dismissal of all such pending applications, even if the alien's
 application had been granted by the IJ and the case was pending
 on appeal. The Attorney General's Soriano decision reversed an
 earlier opinion by the BIA, sitting en banc, that found no
 congressional intent to apply the new restrictions to pending
 applications, and so would have permitted Goncalves' appeal to
 be heard on the merits.
 Because his application had been dismissed, Goncalves
 was taken back into federal custody on June 25, 1997 for
 deportation. On August 8, 1997, Goncalves filed a petition for
 habeas corpus relief in the United States District Court for
 the District of Massachusetts. Goncalves' petition asserted
 that Congress did not intend AEDPA 440(d) to apply
 retroactively, or at the very least that Congress did not
 intend to disrupt pending applications for relief. Goncalves
 also challenged, as a violation of the Equal Protection Clause,
 the government's decision to apply the statutes in a manner
 which made the availability of discretionary relief dependent
 on whether an alien was in deportation proceedings, as
 Goncalves was, or in exclusion proceedings, as Goncalves would
 have been if he had taken a brief trip abroad. The district
 court dismissed Goncalves' petition for a writ of habeas corpus
 on August 14, 1997. On August 26, 1997, this court granted
 Goncalves' motion to stay deportation and for expedited
 consideration of his appeal. Goncalves has been in federal
 custody since June 25, 1997. He was thus in custody when his
 petition was filed and has apparently remained in custody
 throughout these habeas proceedings.
 II. Statutory Background
 In order to understand the issues presented by this
 case, we outline some of the recent changes to our immigration
 laws. In the interim two years between the IJ's denial of
 Goncalves' application for a discretionary waiver of
 deportation and the BIA's dismissal of his application,
 Congress substantially altered the immigration landscape by
 enacting two significant statutes, AEDPA and IIRIRA.
 On April 24, 1996, Congress enacted AEDPA, which, at
 440(d), greatly expanded the category of criminal convictions
 that would render an alien ineligible to apply for 212(c)
 relief. Although AEDPA 440 contained an express "effective
 date" provision, that provision by its terms applied only to 
 440(e) (expanding INA definition of "aggravated felony"), and
 not to 440(d), the subsection which concerns us.
 Additionally, AEDPA 440(a) eliminated statutory
 review pursuant to the APA in the U.S. Courts of Appeals for
 some categories of deportation cases. In cases involving
 denial of an application for discretionary waiver by an alien
 deportable by reason of commission of aggravated felonies, this
 court held in Kolster, supra, that Congress had eliminated the
 statutory grant of jurisdiction in the courts of appeals over
 such claims. Kolster also held that this posed no
 constitutional problems because residual jurisdiction existed
 in the district courts over habeas corpus petitions. That
 holding was consistent with the position taken by the INS;
 indeed, the INS conceded that there would be some form of
 habeas jurisdiction in the district court. Kolster expressly
 reserved issues concerning the source of this habeas
 jurisdiction and the scope of habeas review. See id. at 790
 n.4 & 791. It was in apparent reliance on the Kolster case and
 this court's subsequent decision in Santos v. INS, 124 F.3d 64
 (1st Cir. 1997) (rejecting INS claim that, after passage of
 IIRIRA, petition for review in court of appeals, rather than
 petition for a writ of habeas corpus, was the proper forum to
 raise a jurisdictional or constitutional challenge to an order
 of deportation), that Goncalves filed his petition for habeas
 corpus in the district court.
 Within a short time Congress changed some of the
 rules established by AEDPA. On September 30, 1996, Congress
 enacted IIRIRA. Under IIRIRA there are two new sets of rules:
 the new permanent rules and the "transitional rules." 
 See IIRIRA 309(c), as amended by Act of Oct. 11, 1997, 2,
 Pub. L. No. 104-302, 110 Stat. 3656, 3657. As made clear by
 the technical amendments, the new permanent rules under IIRIRA
 are effective for cases in which the INS instituted removal
 proceedings on or after April 1, 1997. See id. In contrast,
 the transitional rules are to be applied to deportation
 proceedings which were commenced before April 1, 1997. Because
 Goncalves' deportation was initiated before April 1, 1997, his
 claims are governed by the transitional rules, as both the
 Attorney General and Goncalves agree.
 Goncalves' petition, governed by the transitional
 rules, raises pure issues of law. The first is whether, under
 the transitional rules, Congress intended for jurisdiction over
 this case to be vested, if indeed in any court, in the court of
 appeals, as the Attorney General argues, or in the district
 court on petition for habeas corpus, as Goncalves argues. We
 pause to note that the position taken by the Attorney General
 now is the opposite of the position she took in Kolster. If
 the Attorney General is correct, then, she argues, Goncalves
 loses his case because he did not file a petition with this
 court within the thirty day period of time allotted. 
 If Goncalves is correct, there is no time limitations
 problem, but there is a different problem. We must look at
 whether Goncalves may raise on habeas the type of statutory
 claim he now makes: that as a pure issue of law, the Attorney
 General is mistaken in her conclusion that Congress intended
 its restrictions of 212(c) relief to apply retroactively. If
 there was jurisdiction over such a claim, then we must review
 de novo the district court's determination that the Attorney
 General's decision is correct.
 III. Jurisdiction A. Jurisdiction in the Court of Appeals
 The Attorney General argues that Goncalves should
 have presented any claims that he could have made in a petition
 for review to this court within thirty days of the INS's final
 decision, and that he is therefore precluded from making such
 claims on habeas. The short answer is that this argument is
 foreclosed by Kolster, and that any argument that IIRIRA
 requires us to reconsider Kolster is foreclosed by Santos. 
 However, as this court did not fully explain its reasoning in
 Santos, and the Attorney General continues to press this
 argument, we explain why Goncalves could not have filed a
 petition for review in this court.
 We start with the language of the transitional rules
 provisions of the statute, for the general rule is that
 "'[c]ourts created by statute can have no jurisdiction but such
 as the statute confers.'" Christianson v. Colt Indus.
 Operating Corp., 486 U.S. 800, 818 (1988) (quoting Sheldon v.
 Sill, 49 U.S. (8 How.) 441, 449 (1850)). IIRIRA 309(c)(1),
 as amended by Act of Oct. 11, 1997, 2, Pub. L. No. 104-302,
 110 Stat. 3656, 3657, provides:
 Subject to the succeeding provisions of
 this subsection, in the case of an alien
 who is in exclusion or deportation
 proceedings [before April 1, 1997] --
 (A) the amendments made by this
 subtitle shall not apply, and
 (B) the proceedings (including
 judicial review thereof) shall
 continue to be conducted without
 regard to such amendments.
 
 This provision of IIRIRA seemingly supports the Attorney
 General because it makes judicial review of final orders of
 deportation for aliens under the transitional rules subject to
 old INA 106 (as then in effect), which IIRIRA 306(b)
 repeals. Old INA 106 made the judicial review provisions of
 the APA, codified at 28 U.S.C. ch. 158 (1994), applicable (with
 modifications) to immigration decisions. The APA judicial
 review provisions vest the courts of appeals with jurisdiction
 to review final agency action. See 28 U.S.C. 2344 (1994).
 The IIRIRA provision establishing "transitional
 rules," IIRIRA 309(c)(1), is, however, expressly subject to
 IIRIRA 309(c)(4)(G), which provides:
 (4) TRANSITIONAL CHANGES IN JUDICIAL
 REVIEW. -- In the cases described in
 paragraph (1) in which a final order of
 exclusion or deportation is entered more
 than 30 days after the date of enactment
 of this Act, notwithstanding any provision
 of section 106 of the Immigration and
 Nationality Act (as in effect as of date
 of enactment of this Act) to the
 contrary --
 * * *
 (G) there shall be no appeal
 permitted in the case of an alien who
 is inadmissible or deportable by
 reason of having committed a criminal
 offense covered . . . by section 241
 (a)(2)(A)(ii) of such Act (as in
 effect on such date) for which both
 predicate offenses are, without
 regard to their date of commission,
 otherwise covered by section
 241(a)(2)(A)(i) of such Act (as so in
 effect).
 
 Goncalves falls within the language of subpart (G), as the
 parties recognize. 
 A straightforward reading of subpart (G) leads to the
 conclusion that IIRIRA does not permit initial jurisdiction in
 the courts of appeals to hear "appeals" by aliens, like
 Goncalves, who have been convicted of two crimes of moral
 turpitude. The section says "there shall be no appeal," a
 reference to an appeal to the courts of appeals. From this, it
 is clear that there is no grant of jurisdiction to the courts
 of appeals over this category of transitional cases, i.e.,
 claims by aliens deportable by reason of having committed
 specified criminal offenses.
 Despite the literal language of IIRIRA 
 309(c)(4)(G), the Attorney General argues that subpart (G)
 should be read differently, in light of the separate judicial
 review provisions for aliens governed by the permanent rules
 found at IIRIRA 306. The Attorney General relies on IIRIRA
 306(a), which adds new INA 242(g), 8 U.S.C.A. 1252(g)
 (West Supp. 1998):
 "(g) EXCLUSIVE JURISDICTION. -- Except as
 provided in this section [i.e., new INA 
 242] and notwithstanding any other
 provision of law, no court shall have
 jurisdiction to hear any cause or claim by
 or on behalf of any alien arising from the
 decision or action by the Attorney General
 to commence proceedings, adjudicate cases,
 or execute removal orders against any
 alien under this Act."
 
 Although IIRIRA 306 is generally concerned with the permanent
 rules and has an effective date of April 1, 1997 and so does
 not affect Goncalves, there is a special effective date for
 that part of IIRIRA 306 comprising new INA 242(g). Thus, 
 new INA 242(g) applies to Goncalves' claims. The Attorney
 General argues that this provision was meant to consolidate all
 review in the courts of appeals, so that Goncalves can make his
 claims, if at all, only in the courts of appeals.
 But new INA 242(g) does not read as the Attorney
 General suggests. The subsection does not refer to
 consolidation of all cases in the courts of appeals or state
 that the courts of appeals would have "exclusive jurisdiction." 
 The "exclusive jurisdiction" title refers to the grants of
 jurisdiction provided in new INA 242 as does the "except as
 provided in this section" language. The language is not meant
 to consolidate all review in the courts of appeals; indeed, new
 INA 242 has explicit provisions referring to jurisdiction in
 courts other than the courts of appeals. There are provisions
 governing habeas corpus proceedings, and, in a defined category
 of cases, providing for exclusive jurisdiction in the District
 Court of the District of Columbia.
 Indeed, new INA 242 contradicts the Attorney
 General's argument. Of particular significance is new INA 
 242(e)(2), which states that the habeas corpus review of orders
 denying aliens entry to the United States is restricted to
 certain narrow questions. This section assumes that such
 jurisdiction exists, presumably pursuant to 28 U.S.C. 2241. 
 As the courts of appeals ordinarily may not issue original
 writs of habeas corpus but instead will refer such petitions to
 the appropriate district court, see Fed. R. App. P. 22(a), and
 as the Supreme Court will only consider a petition for an
 original writ of habeas corpus in very limited circumstances,
 see Sup. Ct. R. 20(4)(a), the statute apparently assumes that
 such review will initially be in the district courts. Thus,
 the language of new INA 242(g) assumes the existence of some
 habeas jurisdiction in the district court.
 We do not, in conclusion, read the new INA 242 as
 granting jurisdiction to the courts of appeals in transitional
 rules cases over this category of claims. The more difficult
 question, we believe, is whether these provisions were meant to
 preclude any exercise of jurisdiction, even on habeas, over
 claims, constitutional or otherwise, by aliens in the position
 of Goncalves.
 B. Habeas Jurisdiction in the District Courts
 1. Positions of Parties
 We wish to be clear about the Attorney General's
 position. She argues not that all review is precluded but
 rather that some limited scope of review is available to hear
 certain sorts of claims, and that Goncalves' claims do not fall
 within the permissible scope of review. The Attorney General
 argues that there must be an Article III court available to
 hear substantial claims of violation of constitutional rights
 amounting to a fundamental miscarriage of justice. But
 Goncalves himself presents no such claim, she asserts. In
 addition, the Attorney General argues, there must be inherent
 authority in the judiciary to review certain non-constitutional
 claims, i.e., whether the person being deported meets the
 statutory prerequisites: that the person is an alien, has been
 convicted of the crimes, and the convictions are of the sort
 which meet the statutory definitions. But Goncalves, she
 notes, does not present these types of claims either. The
 Attorney General essentially argues there is an inherent
 jurisdiction to hear these constitutional and statutory
 prerequisite categories of claims, although IIRIRA itself makes
 no provisions for either type of review as to aliens like
 Goncalves.
 It is far from clear from what source the Attorney
 General finds the authority for such review. One theory is
 that the authority may be derived not from an explicit
 statutory text but, at best, from the interstices of the
 various immigration statutes. Another theory is that the
 source of jurisdiction is the Constitution itself. Both
 theories present obvious problems. 
 Goncalves asserts that the question he poses -- a
 question of statutory construction -- is subject to judicial
 review. In contrast to the Attorney General, Goncalves grounds
 judicial review directly on statutory authority: the grant of
 habeas corpus jurisdiction under 28 U.S.C. 2241. This grant
 has been part of the juridical fabric of this nation since its
 enactment in the first Judiciary Act. See Judiciary Act of
 1789, 14, 1 Stat. 73, 81-82; see generally Richard H. Fallon,
 Daniel J. Meltzer & David L. Shapiro, Hart and Wechsler's The
 Federal Courts and the Federal System ch. 11, 1 (4th ed.
 1996); Erwin Chemerinsky, Federal Jurisdiction 15.1, at 780
 (2d ed. 1994) (noting Blackstone's reference to the writ of
 habeas corpus as "the most celebrated writ in English law"). 
 It is only if we conclude that Congress intended in IIRIRA to
 eliminate that grant of habeas jurisdiction that we must face
 the question of whether some form of review on habeas is
 mandated by the Suspension Clause, or, as Goncalves argues, by
 the Due Process Clause of the Fifth Amendment or by Article III
 itself, and, if so, the nature of that review.
 2. Congressional Intent to Repeal 28 U.S.C. 2241
 The Attorney General argues that Congress has
 repealed 28 U.S.C. 2241, as applied to immigration cases such
 as this one. Under Felker, supra, the question we must decide
 is whether Congress has expressly repealed or modified the
 federal courts' habeas authority, here under 2241. Felkermakes clear that if Congress intends to repeal or restrict
 habeas jurisdiction under 2241, it must say so explicitly. 
 Thus, we will not find a repeal of 2241 merely by
 implication, but only by express congressional command.
 In Felker, the issue was whether Title I of AEDPA,
 which through 106(b)(1) and (b)(2) amended 28 U.S.C. 
 2244(b), also was meant to eliminate the Supreme Court's
 original habeas jurisdiction under 28 U.S.C. 2241 and 2254.
 In concluding that AEDPA tit. I preserved the Supreme Court's
 jurisdiction to issue original habeas petitions, the Felkercourt applied the model of decision the Supreme Court had used
 more than a century earlier in Ex parte Yerger, 75 U.S. (8
 Wall.) 85 (1869). 
 Ex parte Yerger refused to read an act of Congress as
 impliedly impairing habeas corpus jurisdiction in light of its
 constitutionally protected status. Previously, in Ex parte
 McCardle, 74 U.S. (7 Wall.) 506 (1869), the Supreme Court had
 upheld an act of Congress that expressly restricted appeals of
 habeas cases under the Judiciary Act of 1867, 15 Stat. 385, for
 prisoners in state custody. In Ex parte Yerger, the Court
 avoided impairing the historical core of habeas jurisdiction,
 and addressing the attendant Suspension Clause issues, by
 interpreting the repeal at issue in Ex parte McCardle as
 affecting only appeals under the 1867 Act, and not appeals
 under the Judiciary Act of 1789, which provided the grant of
 habeas jurisdiction for prisoners in federal custody. As
 Goncalves is in federal custody and seeks review of an
 administrative proceeding, not collateral review of a judicial
 proceeding, his case is directly governed by Ex parte Yerger.
 Felker regarded Ex parte Yerger as adopting a general
 rule of construction that any repeal of the federal courts'
 historic habeas jurisdiction, whether for prisoners in federal
 or state custody, must be explicit and make express reference
 specifically to the statute granting jurisdiction. Application
 of the Ex parte Yerger rule to Goncalves' case is thus even
 more appropriate than in Felker itself, as Goncalves is in
 federal custody and has had no judicial review of his claims
 whatsoever.
 There is no question that, unless it has been
 expressly repealed, 2241 provides a basis for reviewing
 immigration decisions. Aliens in custody of federal
 immigration officials have traditionally been able to obtain
 review of immigration decisions by petitioning for a writ of
 habeas corpus under what is now 2241. Soon after the federal
 government began to regulate immigration, the Supreme Court
 considered an argument that the habeas corpus statute did not
 apply to an alien under a theory that the only restraint on his
 liberty was that "he was not permitted to enter the United
 States." United States v. Jung Ah Lung, 124 U.S. 621, 626
 (1888). The Supreme Court rejected this argument as applied to
 aliens in custody of federal officials. See id. Habeas corpus
 review remained the principal avenue for judicial oversight of
 immigration laws until the Supreme Court's decision to allow
 more expansive review of immigration decisions under the APA,
 later codified in old INA 106. See Shaughnessy v. Pedreiro,
 349 U.S. 48 (1955).
 Although the Attorney General suggests that the
 application of the APA to immigration decisions repealed habeas
 review under 2241, we find no authority that supports this
 proposition. The decisions that she says stand for the
 proposition that APA review in the courts of appeals precluded
 any jurisdiction in the district courts concern jurisdiction
 under the APA, not habeas jurisdiction under 2241. See,
 e.g., Agosto v. INS, 436 U.S. 748, 752-53 (1978) (old INA 106
 "eliminated district court review of deportation orders under
 10 of the Administrative Procedure Act, and replaced it with
 direct review in the courts of appeals . . . ." (emphasis
 added)). Indeed, the Supreme Court expressly stated that the
 vesting of jurisdiction to review orders under the APA
 exclusively in the courts of appeals "of course . . . in no way
 impairs the . . . availability of habeas corpus relief." Fotiv. INS, 375 U.S. 217, 231 (1963). The Attorney General's
 argument that Congress' decision to make available another
 avenue for judicial review repeals by implication the previous
 jurisdiction exercised pursuant to 2241 is precisely what
 Felker and Ex parte Yerger do not permit.
 The Attorney General contends, in addition, that
 AEDPA and IIRIRA have expressly repealed jurisdiction under 
 2241. We find no such express language. First, the language
 in IIRIRA that restricts jurisdiction over this category of
 aliens states:
 [N]otwithstanding any provision of section
 106 of the Immigration and Nationality Act
 (as in effect as of the date of enactment
 of this Act) to the contrary --
 * * *
 (G) there shall be no appeal
 permitted in the case of an alien who
 is . . . deportable by reason of
 having committed [particular]
 criminal offense[s] . . . .
 
 IIRIRA 309(c)(4). In Felker, the language at issue in AEDPA
 provided that "the grant or denial of an authorization by a
 court of appeals to file a second or successive application
 shall not be appealable and shall not be the subject of a
 petition . . . for a writ of certiorari." For present purposes
 we see no significant distinction between the language faced by
 the Felker Court that an order "shall not be appealable" and
 the language we face that "there shall be no appeal permitted." 
 Both provisions restrict one avenue of relief -- in Felker, by
 restricting the Supreme Court's jurisdiction to hear appeals
 and to entertain writs of certiorari, and in this case, by
 restricting an "appeal" under the APA judicial review
 provisions. Felker holds that such language is not explicit
 enough impliedly to impair habeas corpus jurisdiction.
 The Attorney General relies also on AEDPA 401(e),
 explicitly repealing old INA 106(a)(10), which had referred
 to habeas jurisdiction. Section 106(a)(10) had provided:
 (10) any alien held in custody pursuant to
 an order of deportation may obtain
 judicial review thereof by habeas corpus
 proceedings.
 Thus, the Attorney General argues, AEDPA eliminates not only
 the prior authorization for the exercise of habeas jurisdiction
 (in addition to APA review) in old INA 106(a)(10), but also
 the basic grant of habeas jurisdiction contained in 28 U.S.C.
 2241.
 However, Congress was explicit that it was striking
 the reference to habeas in old INA 106(a)(10). It did not,
 in contrast, expressly amend or alter 28 U.S.C. 2241. Old
 INA 106(a)(10) was a specialized immigration provision which
 had made clear that aliens with access to the ordinary judicial
 review processes also could seek habeas review if they were in
 custody. This provision ensured that such aliens would have a
 supplemental collateral remedy, and did not apply to aliens
 who could not obtain review under the APA judicial review
 provisions. Aliens without other recourse had traditionally
 been able to obtain review by habeas corpus, even in the face
 of statutory language precluding all other review. SeeHeikkila v. Barber, 345 U.S. 229, 233-35 (1953). In enacting
 AEDPA, Congress was concerned about abuses of duplicative
 judicial remedies, and the elimination of old INA 106(a)(10)
 served that congressional purpose. It does not follow from
 the repeal of this provision of the INA that 2241 habeas
 jurisdiction has been repealed altogether in immigration cases. 
 Had Congress wished to eliminate any possible habeas
 jurisdiction under 28 U.S.C. 2241, it could easily have
 inserted an explicit reference, but it did not.
 This conclusion is reinforced by the fact that both
 IIRIRA and AEDPA make specific reference when they amend or
 repeal statutes granting jurisdiction to the federal courts. 
 See Felker, 116 S. Ct. at 2338-39. For example, AEDPA 
 440(a), the provision at issue in Kolster, made specific
 reference to old INA 106, the judicial review provision,
 providing that "Section 106 of the Immigration and Nationality
 Act (8 U.S.C. 1105a(a)(10)) is amended . . . ." Likewise,
 AEDPA 401(e), eliminating supplemental habeas jurisdiction
 under the INA, refers specifically to "Section 106(a) of the
 Immigration and Nationality Act," not 28 U.S.C. 2241. 
 Similarly, IIRIRA contains numerous provisions
 restricting or altering various avenues for judicial review,
 but in none of these provisions does IIRIRA mention 2241. 
 For example, IIRIRA 306, enacting new INA 242, refers
 specifically to several different grants of jurisdiction. That
 new section contains provisions referring specifically to the
 judicial review provisions of the APA, codified at 28 U.S.C.
 ch. 158, see new INA 242(a)(1), and to the Declaratory
 Judgment Act, codified at 28 U.S.C. 2201, see new INA 
 242(b)(5)(B), (7)(B). The new INA 242 purports to restrict
 the jurisdiction of the federal courts in such proceedings. 
 Indeed, far from repealing 2241 habeas jurisdiction, new INA
 242 presumes the existence of on-going habeas jurisdiction. 
 This severely undermines the Attorney General's argument for
 implied repeal of 2241 in immigration cases. IIRIRA was
 enacted after Felker, and Congress was well aware of the need
 for specific language if it wished to impair the Great Writ.
 Nonetheless, the Attorney General argues that new INA
 242(g), the exclusivity provision, can be read to imply a
 repeal of 2241 even without a specific reference. She argues
 that new INA 242(g) provides that "notwithstanding any other
 provision of law, no court shall have jurisdiction" "except as
 provided in this section," i.e. new INA 242, and so there is
 no need specifically to repeal 2241. The new INA 242,
 argues the Attorney General, is the only source of jurisdiction
 in immigration cases. Thus, it would require a specific
 reference to 2241 to preserve such jurisdiction, rather than
 a specific reference to abolish it. But see Scripps-Howard
 Radio, Inc. v. FCC, 316 U.S. 4, 11 (1942) (noting that, absent
 a specific repeal of jurisdictional authority, "[t]he search
 for significance in the silence of Congress is too often the
 pursuit of a mirage").
 This argument leads us to apply the long standing
 rule disfavoring repeal of jurisdictional provisions by
 implication, a rule which is particularly appropriate here. 
 See Felker, 116 S. Ct. at 2338-39. Although the breadth of the
 "notwithstanding" clause is sweeping, a reading which provided
 for no exceptions would have enormous consequences that are
 contrary to clearly expressed congressional intent. If the
 "notwithstanding" clause of subsection (g) is read to preclude
 any jurisdiction except that specifically authorized in new INA
 242, then that conflicts with IIRIRA 309. Judicial review
 would be blocked not only for the narrow class of aliens in
 Goncalves' position, but for every alien subject to IIRIRA's
 "transitional rules." As new INA 242 is only applicable for
 aliens subject to IIRIRA's "permanent rules," see IIRIRA 309,
 and as new INA 242(g) is applicable immediately, see IIRIRA
 306(c), aliens subject to the transitional rules -- i.e.,
 every alien now in the administrative process whose case began
 prior to April 1, 1997 -- could not obtain any judicial review
 because they cannot take advantage of "this section," i.e., new
 INA 242. Such a reading would clearly conflict with the
 congressional intent expressed in IIRIRA 309 to preserve
 review in the transitional period under old INA 106. 
 Finally, our refusal to find express repeal of 2241
 in new INA 242(g) eliminates the need to address serious,
 novel and complex constitutional issues. We would be loath to
 find a repeal where that repeal creates serious constitutional
 problems. We note these constitutional concerns briefly to
 underscore the wisdom of avoiding them.
 First, a finding that there is no statutory provision
 for any judicial review of the type of claim raised by
 Goncalves would raise substantial and complex constitutional
 questions concerning the limits of Congress' power under
 Article III to control the jurisdiction of the federal courts. 
 The Supreme Court has often interpreted statutes to avoid
 serious constitutional questions presented where statutory
 provisions appeared to foreclose review of constitutional
 claims by an Article III court. See, e.g., Webster v. Doe, 486
 U.S. 592 (1988) (interpreting a statute, to avoid
 constitutional questions, to preserve review of a former CIA
 employee's claim who challenged a decision to fire him because
 of his homosexuality); United States v. Mendoza-Lopez, 481 U.S.
 828, 838-39 (1987) (requiring judicial review of the legality
 of a deportation order if that order is used "to conclusively
 establish an element of a criminal offense").
 Second, a decision that Congress has repealed 2241
 would require us to decide whether the Suspension Clause of the
 Constitution permits Congress to do this. Goncalves seeks
 review under this grant of jurisdiction in a posture which the
 Supreme Court has recognized is the historical core of the
 Suspension Clause -- jurisdiction to review the legality of
 detention by executive branch officers. See Felker, 116 S. Ct.
 at 2339-40 (noting that the writ originally only extended to
 prisoners in federal custody who were not "detained in prison
 by virtue of the judgment of a court" (citation and internal
 quotation marks omitted)); see also Swain v. Pressley, 430 U.S.
 372, 386 (1977) (Burger, C.J., concurring) ("[T]he traditional
 Great Writ was largely a remedy against executive detention.").
 Our interpretation also avoids the question of
 whether the Constitution's Suspension Clause alone, unaided by
 statute, provides jurisdiction and the equally vexing issue of
 what kinds of claims are permitted under such novel
 jurisdiction. That, in turn, would raise the further question
 of the constitutional minimum content of judicial review for
 deportation decisions. 
 For all of these reasons, we find no express
 congressional intent in the language of either AEDPA or IIRIRA
 that prevents an alien who is precluded from seeking judicial
 review under the APA by IIRIRA 309(c)(4)(G) from seeking a
 writ of habeas corpus under 28 U.S.C. 2241 to assert claims
 of the nature being asserted here. "This is the reasonable
 construction of the acts of Congress here in question, and they
 need not be otherwise interpreted. . . . The words here used
 do not require an interpretation that would invest executive or
 administrative officers with . . . absolute, arbitrary power."
 Japanese Immigrant Case, 189 U.S. at 101. Nor do they require
 a construction that would force this court to resolve the
 fundamental constitutional questions a repeal of 2241 would
 provoke.
 3. Does the Scope of Review Include Goncalves' Claims?
 Jurisdiction being proper under 28 U.S.C. 2241, we
 address the further question of whether Congress intended to
 restrict the scope of review on habeas to preclude review of
 the questions Goncalves poses.
 In determining the scope of habeas review, we again
 start with the language of the statute, 2241:
 (a) Writs of habeas corpus may be granted
 by the Supreme Court, any justice thereof,
 the district courts and any circuit judge
 within their respective jurisdictions. 
 The order of a circuit judge shall be
 entered in the records of the district
 court of the district wherein the
 restraint complained of is had. . . .
 (c) The writ of habeas corpus shall not
 extend to a prisoner unless--
 (1) He is in custody under or by color
 of the authority of the United States
 . . . or . . .
 (3) He is in custody in violation of the
 Constitution or laws or treaties of the
 United States.
 
 Both subsections (c)(1) and (c)(3) are applicable here. The
 language of 2241 itself does not contemplate a limitation of
 jurisdiction only to constitutional claims; instead, it
 contemplates challenges based on the "Constitution or laws or
 treaties of the United States."
 Indeed, numerous immigration cases under the 2241
 jurisdiction have considered claims of statutory right,
 sometimes described as an integral part of ensuring due process
 of law. See, e.g., Brownell v. Tom We Shung, 352 U.S. 180, 182
 n.1 (1956) ("due process," enforceable on habeas, includes
 "conformity to statutory grounds"); Kwong Hai Chew v. Colding,
 344 U.S. 33 (1953) (rejecting, on habeas, executive branch
 interpretation of procedural regulation); Wong Yang Sung v.
 McGrath, 339 U.S. 908 (1950) (rejecting, on habeas, executive
 branch's interpretation of APA procedural requirements); Fong
 Haw Tan v. Phelan, 333 U.S. 6 (1948) (rejecting, on habeas,
 executive branch's interpretation of multiple criminal
 conviction deportation provision); Delgadillo v. Carmichael,
 332 U.S. 388 (1947) (rejecting, on habeas, executive branch's
 interpretation of statutory term "entry"); Kessler v. Strecker,
 307 U.S. 22 (1939) (rejecting, on habeas, executive branch's
 interpretation of provision making aliens deportable on
 ideological grounds); Mahler v. Eby, 264 U.S. 32 (1924)
 (rejecting, on habeas, executive branch's interpretation of
 findings necessary for deportation after conviction under
 espionage act); Gegiow v. Uhl, 239 U.S. 3 (1915) (rejecting, on
 habeas, executive branch's interpretation of "public charge"
 ground of exclusion). As Justice Holmes observed in Gegiow,
 the enforcement of statutory claims is essential to ensuring
 that the intent of Congress is observed when it chooses to
 define the grounds for which aliens may be excluded or
 deported:
 The statute, by enumerating the conditions
 upon which the allowance to land may be
 denied, prohibits the denial in other
 cases. And when the record shows that a
 commissioner of immigration is exceeding
 his power, the alien may demand his
 release upon habeas corpus.
 
 Gegiow, 239 U.S. at 9 (emphasis in original).
 The government relies on dictum in Yang v. INS, 109
 F.3d 1185 (7th Cir. 1997), stating that "an error of law does
 not support a writ of habeas corpus . . . ." Id. at 1196. 
 That decision, however, was describing what the Seventh Circuit
 considered to be the minimum content of the constitutional
 writ; recently, the Seventh Circuit has moderated its statement
 in Yang that new INA 242(g) had repealed 28 U.S.C. 2241 in
 all cases. See Turkhan v. INS, 123 F.3d 487, 489-90 (7th Cir.
 1997).
 In other respects, Yang and some similar statements
 in district court opinions, see, e.g., Mbiya v. INS, 930 F.
 Supp. 609, 612 (N.D. Ga. 1996) (requiring a "fundamental
 miscarriage of justice" before a challenge can be made on
 habeas corpus), have their origin in the very different
 standard that is applied to review of federal and state court
 convictions under 28 U.S.C. 2254, 2255. See United Statesv. Timmreck, 441 U.S. 780, 784 (1979) (requiring "complete
 miscarriage of justice" to set free a convicted prisoner who
 alleges violation of a nonjurisdictional federal statute or
 rule).
 In neither AEDPA nor IIRIRA did Congress purport to
 apply state prisoner post-conviction relief rules to the
 entirely different provisions about deportation of aliens. We
 are disinclined automatically to import this standard into
 cases at the core of the traditional writ of habeas corpus --
 initial review of the legality of executive branch detention. 
 This is especially so in light of the long line of precedent
 allowing aliens to make statutory claims on habeas. In cases
 concerning collateral review of state and federal convictions,
 a prisoner has already had substantial judicial review of his
 claims, including a trial and direct review of his conviction,
 often with multiple levels of review, and is seeking
 post-conviction relief. In Goncalves' case, by contrast, no
 court, state or federal, has heard his claims. In fact, it is
 the Attorney General's position that no court will ever have
 jurisdiction or authority to review her decision interpreting
 AEDPA 440(d). The pure statutory claims Goncalves makes here
 are well within precedent interpreting the core habeas
 protection provided by 2241. 
 We address one final argument in favor of the
 Attorney General. The Attorney General contends that, because
 she has discretion to grant or deny this relief from
 deportation in any event, her decision concerning Goncalves'
 statutory eligibility for this form of relief is itself not
 reviewable on habeas. We disagree. Analytically, the decision
 whether an alien is eligible to be considered for a particular
 discretionary form of relief is a statutory question separate
 from the discretionary component of the administrative decision
 whether to grant relief. See, e.g., Ipina v. INS, 868 F.2d
 511, 513 (1st Cir. 1989) (contrasting legal question of whether
 an alien is a "refugee," and thus eligible for asylum, with
 discretionary decision whether to grant asylum).
 Supreme Court precedent also requires us to reject
 this argument. The Court has determined that the refusal of
 the BIA to consider an alien's request for discretionary
 relief, in violation of statute or regulations, is a valid
 claim on habeas corpus. See United States ex rel. Accardi v.
 Shaughnessy, 347 U.S. 260 (1954). In making certain aliens
 eligible for discretionary relief, Congress intended the
 Attorney General or her designated subordinates to make a
 judgment. A refusal to make that judgment would frustrate
 Congress' intent. "[I]f the word 'discretion' means anything
 in a statutory or administrative grant of power, it means that
 the recipient must exercise his authority according to his own
 understanding and conscience." Id. at 266-67. Thus it is no
 answer to Goncalves' argument to emphasize the broad discretion
 of the political branches in immigration matters. It was the
 intent of Congress that such discretion be exercised.
 Our holding is narrow and nothing we say should be
 taken to suggest that such review as is available on habeas is
 necessarily as broad as the traditional administrative review
 available under old INA 106. For example, we are not being
 asked to "review[] and revers[e] the manner in which discretion
 was exercised" by examining "the evidence in the record
 supporting or undermining the alien's claim to discretionary
 relief." Id. at 268. Whether such review is now available on
 habeas presents a different question than Goncalves' claim. 
 The Supreme Court noted, in rejecting early attempts to apply
 the APA to immigration decisions, the very different scope of
 review required by "deciding on 'the whole record' whether
 there is substantial evidence to support administrative
 findings of fact," required by the APA, and the more basic
 review available on habeas that provides for "enforcement of
 due process requirements." Heikkila, 345 U.S. at 235-36. That
 more basic review includes claims of statutory right, but not
 the broad review of administrative decisionmaking available
 under the APA. New INA 242(a)(2)(B) denies jurisdiction to
 review discretionary decisions, at least for most cases under
 the permanent rules. We leave to future cases the task of
 defining the precise limit of the jurisdiction under 28 U.S.C.
 2241 in immigration cases. We hold only that 2241 allows
 us to consider the pure statutory question that Goncalves
 raises in this case.
 4. Decisions of Other Circuits
 Our approach to the jurisdiction-limiting provisions
 of both AEDPA and IIRIRA is in conformity with that of our
 sister circuits. Each circuit court has now held that AEDPA 
 440(a), the initial limitation of jurisdiction which IIRIRA 
 309(c)(4)(G) carries forward, deprives the courts of appeals of
 jurisdiction to entertain petitions for review of aliens
 convicted of specified criminal offenses. In every circuit
 which has addressed constitutional challenges to this
 withdrawal of jurisdiction, the court found that preclusion of
 all judicial review would present serious constitutional
 questions, and in every case those questions were avoided by
 noting the continuing availability of habeas review. Although
 the cases diverge in their approaches, they all agree on these
 two basic points -- that Congress can constitutionally withdraw
 jurisdiction over such petitions for review under old INA
 106, but that some jurisdiction remains on habeas. SeeTurkhan, 123 F.3d at 489-90; Mansour v. INS, 123 F.3d 423, 426
 (6th Cir. 1997); Auguste v. Attorney General, 118 F.3d 723, 726
 n.7 (11th Cir. 1997); Ramallo v. Reno, 114 F.3d 1210, 1214 &
 n.1 (D.C. Cir. 1997); Williams v. INS, 114 F.3d 82, 83-84 (5th
 Cir. 1997); Fernandez v. INS, 113 F.3d 1151, 1154-55 (10th Cir.
 1997); Salazar-Haro v. INS, 95 F.3d 309, 311 (3d Cir. 1996);
 Hincapie-Nieto v. INS, 92 F.3d 27, 30-31 (2d Cir. 1996);
 Duldulao v. INS, 90 F.3d 396, 400 n.4 (9th Cir. 1996). 
 Indeed, many of the courts which have considered constitutional
 challenges cited Felker in support of the view that some
 jurisdiction remains on habeas, and some noted its holding
 disfavoring repeal of 28 U.S.C. 2241 by implication.
 Thus, although no circuit court has yet directly
 faced the issue of whether a court has jurisdiction on habeas
 to consider a claim like Goncalves', the great weight of
 circuit authority is in favor of some form of habeas review for
 aliens in Goncalves' position. We conclude that Goncalves
 properly brought his claim in the district court under its 
 2241 habeas jurisdiction.
 IV. Retroactivity of AEDPA 440(d)
 We turn to the statutory merits question: whether
 Congress intended for AEDPA 440(d)'s restrictions on 212(c)
 relief to apply retroactively to persons in Goncalves'
 position. The Attorney General's Soriano opinion concludes
 that the restrictions are fully retroactive and are applicable
 even to pending applications. We reject the Attorney General's
 reading of Landgraf, supra, a reading that the Supreme Court
 has also recently rejected. See Hughes Aircraft, 117 S. Ct. at
 1876-78. We conclude that Congress did not intend AEDPA 
 440(d) to apply retroactively to Goncalves' application.
 A. Deference
 Initially, we must consider what deference is owed to
 the Attorney General's Soriano decision holding that AEDPA
 440(d) is retroactive and applies to pending applications for
 212(c) relief. The Attorney General argues that the plain
 text of AEDPA 440(d) does not answer the question of whether
 it is retroactive or applies to pending cases and that her
 interpretation regarding its effective date is, at least, a
 reasonable one under Chevron USA, Inc. v. Natural Resources
 Defense Council, 467 U.S. 837 (1984). As the Attorney General
 notes, under the familiar formulation, "[i]f the statute is
 silent or ambiguous with respect to the specific issue, the
 question for the court is whether the agency's answer is based
 on a permissible construction of the statute." Id. at 843.
 We think it is a significant question whether the
 determination of the application of the effective date of a
 governing statute is the sort of policy matter which Congress
 intended the agency to decide and thus whether the doctrinal
 underpinnings of Chevron are present here. When Congress wants
 an agency to determine whether to apply new rules, it usually
 delegates that discretion expressly. See, e.g., IIRIRA 
 309(c)(2), (3) (giving the Attorney General discretion in some
 cases to determine whether to apply transitional or permanent
 rules). The question of whether AEDPA 440(d) applies
 retroactively may be viewed as a "pure question of statutory
 construction for the courts to decide," Cardoza-Fonseca, 480
 U.S. at 446, a question that is "quite different from the
 question of interpretation that arises in each case in which
 the agency is required to apply [statutory] standards to a
 particular set of facts" which involves the agency's particular
 expertise. Id. at 448. Nonetheless, we will assume arguendo
 that the Attorney General's opinion is subject to Chevronanalysis.
 Chevron, though, requires a two-step analysis. The
 Attorney General's argument for deference bypasses the first
 step, which is to determine whether Congress has provided an
 answer to the specific question presented. "If, by 'employing
 traditional tools of statutory construction,' we determine that
 Congress' intent is clear, 'that is the end of the matter.'" 
 Regions Hosp. v. Shalala, No. 96-1375, 1998 WL 71823, at *6
 (U.S. Feb. 24, 1998) (quoting Chevron, 467 U.S. at 842-43). 
 Those traditional tools of statutory construction include the
 familiar presumptions we employ, including Landgraf's
 presumption against retroactivity.
 A contrary approach would permit the executive branch
 effectively to thwart the intent of Congress, made plain
 through a careful reading of the statutory provision at issue
 in context, so long as the executive branch's interpretation
 was a plausible reading of isolated statutory terms. Instead,
 as Chevron itself made clear, "[t]he judiciary is the final
 authority on issues of statutory construction and must reject
 administrative constructions which are contrary to clear
 congressional intent." Chevron, 467 U.S. at 843 n.9.
 The Supreme Court has consistently rejected agency
 arguments for deference which would impair the courts' ability
 to examine congressional intent using our "'traditional tools
 of statutory construction.'" Regions Hosp., 1998 WL 71823 at
 *6 (quoting Chevron, 467 U.S. at 843 n.9). Instead, to
 determine whether Congress intended AEDPA 440(d) to apply to
 such pending applications, we examine that provision in the
 normal manner. We look to that section not in isolation, but
 in the context of Title IV of AEDPA (which contains its
 immigration provisions) and in light of Title IV's overall
 structure. 
 We are guided by Landgraf principles and seek a plain
 statement from Congress that expressly provides for retroactive
 application. "The plainness or ambiguity of statutory language
 is determined by reference to the language itself, the specific
 context in which that language is used, and the broader context
 of the statute as a whole," not by looking at statutory terms
 in isolation. Robinson v. Shell Oil Co., 117 S. Ct. 843, 846
 (1997). In United States v. Rivera, 131 F.3d 222 (1st Cir.
 1997) (en banc), this court noted "'the cardinal rule that a
 statute is to be read as a whole . . ., since the meaning of
 statutory language, plain or not, depends on context.'" Id. at
 225 (quoting Conroy v. Aniskoff, 507 U.S. 511, 515 (1993)).
 We next examine AEDPA's legislative history, not as
 a substitute for examination of AEDPA's text, but only as a
 check to see that our initial textual interpretation does not
 conflict with "a clearly expressed legislative intention
 contrary to the statutory language which would require the
 court to question the strong presumption that Congress
 expresses its intent through the language it chooses." Rivera,
 131 F.3d at 226 (citation, internal quotation marks and
 alterations omitted).
 Throughout, our statutory analysis is guided by the
 Supreme Court's retroactivity jurisprudence. In Landgraf,
 supra, the Supreme Court noted that, while "a court is to apply
 the law in effect at the time it renders its decision," id. at
 264 (internal quotation marks and citations omitted), there is
 a strong presumption "deeply rooted in our jurisprudence . . .
 and centuries older than our Republic" against retroactivity. 
 Id. at 265. The Attorney General's application of the new
 AEDPA restrictions takes away a form of relief that, while
 discretionary, is plainly substantive, and so implicates
 Landgraf's presumption against retroactivity. Such
 discretionary relief has been available in our system in some
 form since at least 1917; the origin of 212(c) relief is in
 the Seventh Proviso to 3 of the Immigration Act of 1917. SeeFrancis, 532 F.2d at 270. In a substantial number of cases,
 aliens under deportation orders were granted such relief,
 usually on a showing that they had reformed their ways and
 become productive members of society. Indeed, from fiscal
 years 1989 through 1994, it appears that over half of all
 applications for 212(c) relief were granted by the agency. 
 See Mojica v. Reno, 970 F. Supp. 130, 178 (E.D.N.Y. 1997). 
 AEDPA's restrictions on 212(c) relief, as applied to
 Goncalves, thus clearly raise retroactivity concerns, requiring
 a close examination of AEDPA's text to determine whether
 Congress has expressly chosen to make its restrictions
 retroactive.
 B. Text
 Title IV of AEDPA contains provisions restricting
 relief from deportation for two categories of aliens -- aliens
 involved in terrorism and aliens convicted of ordinary crimes. 
 Many of these provisions, with the notable exception of the
 provision of concern to us, AEDPA 440(d), contain explicit
 subsections stating that they apply retroactively. We review
 these other provisions in determining whether Congress likewise
 intended to apply AEDPA 440(d) retroactively. Two provisions
 restricting relief from deportation for aliens involved in
 terrorism, AEDPA 413 and 421, are particularly helpful in
 this respect. 
 Under AEDPA 413, alien terrorists are made
 ineligible for several different forms of relief from
 deportation. That section contains an explicit "effective
 date" subsection, which provides:
 The amendments made by this section shall
 take effect on the date of the enactment
 of this Act and shall apply to
 applications filed before, on, or after
 such date if final action has not been
 taken on them before such date.
 Id. 413(g). This language explicitly provides that the
 restrictions on relief from deportation imposed on alien
 terrorists should apply to all cases pending at the time of
 AEDPA's enactment, as long as "final action" had not yet been
 taken. 
 If Congress thought that such restrictions would as
 a matter of course be applied to pending cases, as the Attorney
 General's argument requires, then this provision would have
 accomplished nothing. In Bennett v. Spear, 117 S. Ct. 1154
 (1997), the Court noted "the cardinal principle of statutory
 construction that it is our duty to give effect, if possible,
 to every clause and word of a statute." Id. at 1166
 (citations, internal quotation marks and alterations omitted);
 accord Walters v. Metropolitan Educ. Enters., 117 S.Ct. 660,
 664 (1997). This is particularly true when there is a contrast
 in language between two sections of the same statute. "Where
 Congress includes particular language in one section of a
 statute but omits it in another section of the same Act, it is
 generally presumed that Congress acts intentionally and
 purposely in the disparate inclusion or exclusion." Cardoza-
 Fonseca, 480 U.S. at 432 (citation, internal quotation marks
 and alterations omitted).
 The Attorney General responds by drawing a
 distinction between provisions restricting discretionary
 relief, such as 440(d) (applicable here), and provisions
 restricting relief that she says involve no exercise of
 discretion. The Attorney General argues that discretionary
 relief, such as 212(c) relief, is best analogized to
 prospective injunctive relief, restrictions of which, under
 Landgraf's judicial default rules, are generally held to be
 applicable immediately and not to present any retroactivity
 concerns. See Landgraf, 511 U.S. at 273-74. Thus, the
 Attorney General concludes, Congress would have expected
 restrictions on such discretionary relief to apply to pending
 cases even in the absence of an explicit "effective date"
 provision, and would have felt no need to include an express
 provision making those restrictions retroactive.
 By contrast, the Attorney General continues, AEDPA 
 413 restricts several forms of relief for alien terrorists, not
 all of which are discretionary. In the absence of an explicit
 "effective date" provision, the Attorney General concludes,
 Congress would expect the courts to apply Landgraf's normal
 presumption against retroactivity. This, she says, explains
 the difference between 413, denying relief for alien
 terrorists, and 440(d), denying relief for aliens convicted
 of ordinary crimes.
 The Attorney General's argument both misinterprets
 Landgraf and fails on its own terms. The argument
 misinterprets Landgraf because it effectively would apply a
 presumption in favor of retroactive application to any
 restriction of relief that could be described as
 "discretionary." The argument fails to recognize that "the
 only 'presumption' mentioned in that opinion is a general
 presumption against retroactivity." Hughes Aircraft, 117 S.
 Ct. at 1878. Following the Attorney General's position would
 have significant consequences. It would require Congress to
 draft an explicit "effective date" provision to ensure against
 retroactive application in any case in which a statute takes
 away relief to which a party was not automatically entitled. 
 But Landgraf requires an express congressional command only to
 overcome its presumption against retroactivity, not to ensure
 application of a statutory term prospectively. See Lindh v.
 Murphy, 117 S. Ct. 2059, 2062 (1997).
 Indeed, in Landgraf itself a similar argument was
 made and rejected by the Supreme Court. Landgraf refused to
 apply amendments to Title VII that enlarged the damages that
 could be awarded to victims of discrimination retroactively,
 despite the fact that the employer would only face liability if
 he engaged in conduct that was at the time illegal. "Even when
 the conduct in question is morally reprehensible or illegal, a
 degree of unfairness is inherent whenever the law imposes
 additional burdens based on conduct that occurred in the past." 
 Landgraf, 511 U.S. at 282-83 n.35. Similarly, in Hughes
 Aircraft, the Court again rejected an argument that a statute
 is not retroactive if the conduct for which it imposes
 additional consequences was already unlawful, and thus the
 defendant had no "right" to engage in such conduct. The Hughes
 Aircraft Court nevertheless determined that the unfairness of
 imposing "additional burdens" on such conduct retroactively
 invoked the Landgraf presumption. See id. at 1876-77. Thus,
 that Goncalves' crimes made him deportable prior to the passage
 of AEDPA and that the new restrictions merely eliminated a
 possible form of relief from those consequences, do not suffice
 to rebut the presumption against retroactivity.
 Similarly, the Attorney General's reliance on a
 description in Landgraf of the kinds of statutes that often
 provoke retroactivity concerns is misplaced. In Landgraf, the
 Court noted, with approval, Justice Story's "influential
 definition" of impermissibly retroactive statutes:
 Every statute, which takes away or impairs
 vested rights acquired under existing
 laws, or creates a new obligation, imposes
 a new duty, or attaches a new disability,
 in respect to transactions or
 considerations already past, must be
 deemed retrospective.
 Landgraf, 511 U.S. at 269 (citations and internal quotation
 marks omitted). In Hughes Aircraft, however, the Court
 expressly held that this language "does not purport to define
 the outer limit of retroactivity;" that such effects on what
 may be considered "vested rights" "constitute[] a sufficient,
 rather than a necessary, condition for invoking the presumption
 against retroactivity." 177 S. Ct. at 1876. The Attorney
 General's reliance on the fact that aliens have no "vested
 right" to discretionary relief thus "simply misreads [the
 Court's] opinion in Landgraf," id., converting it from an
 opinion urging against retroactive application to an opinion
 requiring special congressional attention to avoid retroactive
 application. Although crimes "involving moral turpitude" did
 expose Goncalves to deportation before AEDPA, he had a
 statutory right to apply for 212(c) relief unless he had
 committed an aggravated felony. To preclude Goncalves from
 applying for such relief now plainly "attaches a new
 disability" and imposes additional burdens on past conduct. 
 Hughes Aircraft, 117 S. Ct. at 1876 (quoting Landgraf, 511 U.S.
 at 269).
 Even if Supreme Court precedent permitted this type
 of analysis, which it does not, the Attorney General's argument
 fails on its own terms. She says that the reason alien
 terrorists are subject to a specific retroactivity provision
 applying the new restrictions to pending applications (and
 criminal aliens are not) is that the forms of relief that AEDPA
 precludes for alien terrorists were not discretionary. In
 this, the Attorney General misreads the statute.
 Alien terrorists had been eligible for certain forms
 of discretionary relief, and Congress nevertheless provided
 expressly for application of the new restrictions on these
 forms of relief to pending applications. Of the five forms of
 relief from deportation precluded by 413, only one,
 "withholding of deportation," is a form of relief to which an
 alien is entitled if eligible. The rest were committed to the
 discretion of the Attorney General. Thus, except for the
 relief precluded by AEDPA 413(a), all of the relief precluded
 by 413 was discretionary relief. The fact that 413
 contains an "effective date" subsection that applies to the
 entire section suggests that Congress thought it was necessary
 to be explicit in making the new restrictions applicable to
 pending applications for relief, regardless of whether the
 relief was discretionary or mandatory; otherwise, the
 retroactivity provision would not be needed.
 Finally, in another section, Congress explicitly made
 a restriction on discretionary relief retroactive through an
 express "effective date" provision. See AEDPA 421. As that
 section concerns only asylum applications, under the Attorney
 General's reading no "effective date" provision would be needed
 because asylum is a discretionary form of relief. See Cardoza-
 Fonseca, 480 U.S. at 429 & n.6. Thus, 421 confirms our
 reading; Congress did not draft express retroactivity
 provisions only for mandatory forms of relief.
 Thus, Congress expected, unless it said to the
 contrary, that new restrictions would not be applied
 retroactively to pending applications. This is the most
 natural reading of Congress' decision to include language in 
 413 and 421 making the new restrictions applicable to the
 pending applications of alien terrorists, but omitting such
 language in 440(d), the provision denying relief to aliens
 convicted of specified criminal offenses. Furthermore,
 Congress did not treat discretionary restrictions on relief
 differently than restrictions on other forms of relief. The
 Attorney General offers no other alternative explanation for
 the different language that the statute uses in dealing with
 these two categories of alien offenders.
 Our interpretation is eminently rational when tested
 in light of Congress' principal purposes in enacting AEDPA. 
 Those purposes are announced in the Act's title -- preventing
 terrorism and providing for an "effective" death penalty. SeeAEDPA 1. Congress could well have decided that the
 unfairness of upsetting settled expectations was outweighed by
 the importance of fighting terrorism, while deciding against
 making retroactive the new restrictions on 212(c) relief for
 aliens who are not terrorists but are convicted of ordinary
 crimes.
 C. Legislative History
 We examine AEDPA's legislative history to determine
 whether we have erred in our interpretation of the text. SeeLandgraf, 511 U.S. at 262 (permitting resort to legislative
 history to confirm textual analysis); Cardoza-Fonseca, 480 U.S.
 at 432-33; Rivera, 131 F.3d at 226. We do so only to determine
 if there is a clearly expressed legislative intention contrary
 to our textual reading, not as a substitute for a textual
 analysis. See Rivera, 131 F.3d at 226. The history of AEDPA,
 far from demonstrating a clearly expressed contrary intent,
 further demonstrates Congress' attention to "effective date"
 provisions and thus supports our reading of AEDPA's text. 
 One of the most striking things about the legislative
 history is that the original Senate version of the bill which
 became AEDPA did contain express language making the provision
 which became AEDPA 440(d) retroactive; but this language was
 eliminated by the conference committee and was not included in
 the final bill. The origins of 440(d) were in 1995, when
 Senators Dole and Hatch and several co-sponsors introduced the
 restriction on 212(c) relief that became AEDPA 440(d). The
 restriction was introduced as part of an amendment in the
 nature of a substitute for their own antiterrorism bill, S.
 735, 104th Cong. (1995) (the "Senate bill"). See 141 Cong.
 Rec. S7553 (daily ed. May 25, 1995) (text of amendment). That
 amended Senate bill, at 303(e)(4), contained the provision
 that later became AEDPA 440(d), limiting relief for aliens
 convicted of ordinary crimes. Within that section, 303(f)
 then provided:
 The amendments made by this section [i.e.,
 303 of the Senate bill] shall take
 effect on the date of the enactment of
 this Act and shall apply to cases pending
 before, on, or after such date of
 enactment.
 
 141 Cong. Rec. S7559 (daily ed. May 25, 1995). Thus, the
 amended Senate bill contained an "effective date" provision,
 expressly applicable to what later became AEDPA 440(d), which
 provided for retroactive application of its restrictions on 
 212(c) relief. The language is strikingly similar to what
 later became AEDPA 413, the provision restricting relief for
 alien terrorists. The full Senate passed this version of the
 Senate bill on June 7, 1995. See 141 Cong. Rec. S7857, S7863
 (daily ed. June 7, 1995).
 Meanwhile, the House of Representatives was
 considering a different version of the antiterrorism bill, H.R.
 2703, 104th Cong. (1996) (the "House bill"). Like the Senate
 bill, the House bill contained provisions restricting relief
 from deportation both for terrorists and for aliens convicted
 of ordinary crimes. However, in the case of ordinary crimes,
 the House bill only eliminated 212(c) relief for aliens
 convicted of more serious crimes and was prospective. SeeH.R. 2703, 104th Cong. 662 (1996), at 142 Cong. Rec. H2295
 (daily ed. Mar. 14, 1996). By contrast, the House bill, like
 the final legislation, contained explicit "effective date"
 subsections in its provisions limiting relief for alien
 terrorists which made those restrictions retroactive. See H.R.
 2703 611(b), 612(f), at 142 Cong. Rec. H2293, H2294 (daily
 ed. Mar. 14, 1996) (House bill provisions corresponding to
 AEDPA 421(b) and 413(g), respectively). When the Senate
 bill was called up on the House floor on March 14, 1996, the
 House amended the Senate bill by replacing its text with the
 text of the House version. See 142 Cong. Rec. H2268, H2304
 (daily ed. Mar. 14, 1996). The House asked for a conference
 with the Senate, insisting on its version of the legislation. 
 See id. at H2304.
 One month later, a bipartisan conference committee
 emerged with a compromise in the form of AEDPA 440. The
 legislation contained both the House bill's expanded definition
 of "aggravated felony" and the Senate bill's restrictions on 
 212(c) relief for aliens convicted of ordinary "crimes
 involving moral turpitude," but notably did not contain the
 Senate bill's original language making those restrictions
 retroactive. See H.R. Rep. No. 104-518, at 119 (1996),
 reprinted in 1996 U.S.C.C.A.N. 944, 952 (adopting 303(e)(4)
 of the Senate bill without adopting 303(f), the subsection
 that made those restrictions applicable to pending cases). The
 legislation also contained the House version of the provisions
 eliminating relief for alien terrorists, and the House language
 making those provisions retroactive. A contrast in statutory
 language is "particularly telling" when it represents a
 decision by a conference committee to resolve a dispute in two
 versions of a bill, and the committee's choice is then approved
 by both Houses of Congress. See FEC v. NRA Political Victory
 Fund, 513 U.S. 88, 95 (1994).
 This chronology also illustrates a second important
 point: Congress' awareness of the issue of whether restrictions
 on relief should be applied retroactively. In the final
 legislation, Congress decided to provide for such retroactive
 application in 413 and 421, but not in 440(d), a position
 consistent with the House approach of treating the two
 categories of aliens differently with respect to AEDPA's
 temporal reach. "'Few principles of statutory construction are
 more compelling than the proposition that Congress does not
 intend sub silentio to enact statutory language that it has
 earlier discarded in favor of other language.'" Rivera, 131
 F.3d at 227 (quoting Cardoza-Fonseca, 480 U.S. at 442-43); cf.Lonchar v. Thomas, 116 S. Ct. 1293, 1300 (1996) (courts should
 not read habeas statute to impose a requirement that Congress
 expressly "rejected, by removing [it] from the draft Rule"). 
 Adopting the Attorney General's interpretation would require us
 to do precisely that, upsetting a compromise provision that was
 intended to reconcile the House's and Senate's very different
 approaches to aliens convicted of crimes.
 A third point emerges from the legislative history. 
 We note that Congress amended AEDPA 440(d) when it enacted
 IIRIRA on September 30, 1996. See IIRIRA 306(d). Three
 months earlier, on June 27, the BIA had determined that
 Congress did not intend AEDPA 440(d) to apply to pending
 cases. Significantly, the very same Congress that had enacted
 AEDPA just five months earlier, on April 24, did not take the
 opportunity to overrule that BIA decision by providing
 expressly that the new restrictions were fully retroactive and
 applied to pending cases. This was true even though Congress
 specifically amended AEDPA 440(d) in other respects and was
 presumptively aware of what was then the governing agency
 interpretation. Cf. Lorillard v. Pons, 434 U.S. 575, 580
 (1978) ("Congress is presumed to be aware of an administrative
 or judicial interpretation of a statute and to adopt that
 interpretation when it re-enacts a statute without change."
 (citations omitted)). Such subsequent legislative
 developments, although never determinative in themselves, can
 be "significant" clues to congressional intent. See Cardoza-
 Fonseca, 480 U.S. at 430; Sweet Home Chapter, 515 U.S. at 700-
 01. This is particularly so when the amendment to AEDPA 
 440(d) was enacted by the same Congress and was enacted after
 an agency had interpreted the statute in a way which would have
 required a more explicit statutory statement if Congress
 intended the statute to be interpreted differently. Cf.Cardoza-Fonseca, 480 U.S. at 430 (relying on the actions of
 subsequent congresses as clues to legislative intent); Sweet
 Home Chapter, 515 U.S. at 700-01 (same); Lomas Mortgage, Inc.v. Louis, 82 F.3d 1, 6-7 (1st Cir. 1996).
 "We find these ordinary canons of statutory
 construction compelling, even without regard to the
 longstanding principle of construing any lingering ambiguities
 in deportation statutes in favor of the alien." Cardoza-
 Fonseca, 480 U.S. at 449. A careful reading of the text of
 AEDPA, confirmed by an examination of its legislative history,
 demonstrates that Congress did not intend AEDPA 440(d) to
 apply retroactively to pending applications for 212(c) relief
 by persons convicted of ordinary "crimes involving moral
 turpitude."
 V. Conclusion
 Despite the length of this opinion, our holding is
 narrow. The district court had jurisdiction over Goncalves'
 petition for a writ of habeas corpus under 28 U.S.C. 2241
 given the precise nature of the claims asserted. The scope of
 that habeas jurisdiction is not limited to constitutional
 claims, but encompasses at least the pure issues of law
 concerning the applicability of statutory provisions to pending
 cases which Goncalves has raised. We have rejected an argument
 that there is no jurisdiction to consider these pure issues of
 law merely because Goncalves is not entitled to relief from
 deportation. Rather the question is whether he is entitled to
 be considered for such relief, and we have determined that he
 is. However, we need not reach the issue of what review (if
 any) may be available on habeas in cases when an alien attempts
 to obtain review of an individual 212(c) or "cancellation of
 removal" determination by styling it as a pure issue of law,
 except to note that Congress apparently intended the scope of
 such review, if any, to be narrower than the "abuse of
 discretion" review that was formerly available under old INA
 106, at least for aliens subject to the permanent rules.
 We have also determined, through a careful reading of
 AEDPA's text, confirmed by its legislative history, that
 Congress did not intend AEDPA 440(d) to apply retroactively
 to persons in Goncalves' position. We do not reach Goncalves'
 constitutional challenges.
 The judgment of the district court is reversed, and
 Goncalves' petition for a writ of habeas corpus is granted to
 this extent: the case is remanded to the Board of Immigration
 Appeals for a discretionary determination of the merits of
 Goncalves' application for relief under old INA 212(c). It
 is, of course, up to the Attorney General, through the BIA,
 whether to exercise her discretion to allow Goncalves to avoid
 deportation.